[No. D013074. Fourth Dist., Div. One. Feb. 25, 1992.]

MICHAEL DAMESHGHI, Plaintiff and Appellant, v.
TEXACO REFINING AND MARKETING, INC., et al., Defendants and
Respondents.

[Nos. D014129, D014481. Fourth Dist., Div. One. Feb. 25, 1992.]

MICHAEL DAMESHGHI, Plaintiff and Appellant, v.
BUSINESS OPPORTUNITIES UNLIMITED, INC., et al., Defendants and
Respondents.

**COUNSEL**

Kindel & Anderson, David Laufer and David Gurnick for Plaintiff and Appellant.

Latham & Watkins, Deanne P. George, Matthew L. Lalli, Solomon, Ward, Seidenwurm & Smith, William O. Ward III, Robert E. Fuller, Cynthia M. Tausch and John L. Odell for Defendants and Respondents.

**OPINION**

HUFFMAN, J.—Plaintiff Michael Dameshghi appeals the judgments separately entered in favor of two groups of defendants and respondents,

(1) Texaco Refining and Marketing, Inc., (Texaco), its individual employees, Gary Kirner and C. T. Trammell, and its franchisee, Gilbert Peet, and (2) the real estate brokers and escrow agents, Business Opportunities Unlimited, Inc. (B.O.U.), Joseph Tausch, Cynthia Tausch, and Ghassan El-Khoury (the broker/escrow defendants), who were involved in Dameshghi's failed attempt to purchase Peet's Texaco service station. The trial court granted a motion for summary judgment brought by Texaco and its employees, as well as a similar motion by Peet, on the grounds that there were no triable issues of fact as to the contractual rights claimed by Dameshghi. (Code Civ. Proc., § 437c.) At later proceedings, the trial court granted a motion for nonsuit in favor of the broker/escrow defendants and awarded attorney fees and costs in their favor. (Code Civ. Proc, § 581c; Civ. Code, § 1717.)

Dameshghi argues on appeal that Texaco unlawfully exercised a right of first refusal that it was not entitled to or, alternatively, that it waived under Business and Professions Code[1] section 21148, subdivision (a)(5). Dameshghi also contends the trial court erred in granting summary judgment on his causes of action against Texaco alleging violation of the Franchise Investment Law (Corp. Code, § 31000 et seq.), and claims he is entitled to standing to pursue such claims as an offeree of the franchise, even though he never achieved the status of franchisee. Dameshghi further claims that because Texaco bought the station from Peet, Peet thereby breached his contract to sell the station to Dameshghi.

In related contentions against the broker/escrow defendants, Dameshghi argues his opening statement at trial contained sufficient reference to proximate causation of his damages by the acts of the brokers and escrow officers so as to overcome their nonsuit motion. Dameshghi also contends the trial court erred in granting that motion by making erroneous rulings on contractual law, and abused its discretion by refusing to hear Dameshghi's proposed testimony about his contractual intent.

Correctly interpreted, neither section 21148 nor the provisions of the Franchise Investment Law (Corp. Code, § 31000 et seq.) support Dameshghi's claims. We conclude the trial court appropriately entered summary judgment for the Texaco group and Peet, and was justified in granting nonsuit and awarding fees to the broker/escrow defendants. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1986, Peet decided to sell his Texaco gasoline station which he operated pursuant to a franchise lease for a three-year period. He listed the

---

[1] All statutory references are to the Business and Professions Code unless otherwise specified.

business for sale with B.O.U., a real estate brokerage which also performed escrow services, and Dameshghi's brother-in-law (not a party to this action) made an offer to purchase. On August 1, 1986, Dameshghi's brother (also a nonparty here) signed Dameshghi's name to the escrow instructions (without disclosing his own identity).[2] The instructions provided that Dameshghi would purchase Peet's interest in the station for $53,200. They were prepared by B.O.U. and its employee Cynthia Tausch, and provided that "[t]he consummation of this escrow is contingent upon the approval of buyer by [Texaco] and the transfer of the lease to buyer by Texaco." Peet, as seller, further agreed "to personally effect transfer of lease to buyer and to deliver the lease and assignment into escrow." The escrow defendants also prepared a form assignment of lease for Texaco's signature, which was never executed. Both the original offer to purchase and the escrow instructions (superseding the offer) contained attorney fees and indemnity clauses benefiting the broker/escrow defendants. At all times, the parties and the trial court treated the escrow instructions as the operative contract.

Peet told Texaco's local representative, defendant and respondent Gary Kirner, that he had a prospect for the purchase of his business. Dameshghi submitted a credit application to Kirner, which showed he had no prior experience owning or operating a service station. The credit application was approved. Dameshghi sent his brother (the one who had originally signed the papers) to Texaco's two-week station manager school, which he completed in September 1986.

In late September 1986, on behalf of Texaco, Kirner sent Dameshghi a package of papers concerning the Peet sale, care of the escrow defendants. Included were a proposed one-year trial franchise lease, a proposed fuel supply agreement and a credit card agreement.

Dameshghi went to the escrow office to review and sign the papers, but when he realized that a one-year lease, rather than a three-year lease, had been submitted, he objected to the broker El-Khoury that he had expected to assume Peet's existing three-year lease.[3] Dameshghi asked El-Khoury to call Kirner to indicate that he did not want the one-year lease, and sought to enter into the three-year lease. At his deposition, El-Khoury described that conversation with Kirner as follows:

"I asked him what he wanted to do to assume the exisiting [*sic*] lease, how it would affect the time table, possessions. And he informed me that, then

---

[2] The broker/escrow defendants have raised a defense to Dameshghi's action that under the equal dignities rule (*Ellis* v. *Mihelis* (1963) 60 Cal.2d 206 [32 Cal.Rptr. 415, 384 P.2d 7]), Dameshghi may not adopt his brother's signature as his own without an authorization in writing for that purpose. We discuss this contention as needed in part II, *post*.

[3] El-Khoury subsequently declared and was discharged from bankruptcy and is not a party to this appeal.

we'll have to send him the whole package that we had, and he would have to run it by their marketing and have a different package sent to us. And I inquired on the time that that would take, and he then informed me it would take a couple of weeks. I relayed the message to Mr. Dameshghi, and he approved. He said, go ahead with assuming, the process to assume the existing lease."

Dameshghi's version of this conversation, as found in his declaration in support of his motion for summary judgment, recounted that when El-Khoury entered the room after talking to Kirner, he told Dameshghi that Texaco informed him "that I could accept the one-year lease or wait for a new three-year lease to be prepared. [¶] [] Because I wanted a three-year lease on Gilbert Peet's Texaco as . . . originally agreed, I did not sign the one-year lease presented to me at that September 26, 1986 meeting." At Dameshghi's deposition, he testified he did not want a one-year lease because he believed it would give him insufficient protection.[4]

Kirner asked Peet to send him a letter requesting Texaco's permission to assign his lease to Dameshghi. On October 8, 1986, Peet did so, giving the selling price and terms of the sale. On October 10, 1986, Kirner forwarded Peet's letter with a cover memorandum to his superiors at Texaco's Los Angeles office. Kirner's cover memorandum stated he was returning the trial lease package and requested that the existing lease assignment be approved effective November 1, 1986. Kirner's superior then directed him to obtain the terms of Dameshghi's escrow offer to Peet. The escrow instructions were sent to Kirner's superior in Los Angeles on October 22, 1986.

The Los Angeles office recommended that Texaco withhold its consent to Peet's assignment of the lease to Dameshghi, and purchase the business itself. Texaco's division manager, defendant and respondent C. T. Trammell, adopted that recommendation and on November 11, 1986, sent a letter to Peet notifying him Texaco elected to purchase the business. The escrow instructions for Dameshghi's offer to purchase Peet's station were accordingly amended to substitute Texaco in place of Dameshghi. Dameshghi did not learn of the amendment or the sale to Texaco until sometime after the sale had been completed.

Approximately one year after Texaco bought Peet's station, Dameshghi filed his civil complaint alleging 16 causes of action against Texaco, its

---

[4]In a later declaration Dameshghi submitted in opposition to a motion for summary judgment that the broker/escrow defendants made (which was denied), Damesghi gave another version of his wishes: He stated that if he had known that "Texaco would exercise a right of first refusal on the three-year lease, I would have signed the one-year assignment and taken other steps to obtain the three-year lease as originally agreed."

employees Kirner and Trammell, the broker/escrow defendants B.O.U., Joseph Tausch, Cynthia Tausch, and El-Khoury, and the seller Peet. As against Texaco and its employees, Dameshghi pled the lease documents provided to him were unsatisfactory, and alleged the following causes of action: statutory violation of section 21148, breach of oral contract (to supply the three-year lease documents), interference with contract, and conversion. Additional claims under the Franchise Investment Law (Corp. Code, § 31000 et seq.) were pled as follows: misrepresentation under Corporations Code section 31201, failure to provide a franchise offering circular as required by Corporations Code section 31119, violation of registration or exemption requirements under Corporations Code sections 31101 and 31114, and a claim that Texaco failed to file a required notice of exemption or to register to offer or sell franchises as required by Corporations Code section 31110.[5]

As against Peet, the seller, three specific causes of action were pled: breach of written sales contract, conversion, and interference with prospective advantage.

As against the broker/escrow defendants, Dameshghi brought two causes of action for negligence, as well as pleading negligent misrepresentation. He also sued these defendants for breach of fiduciary duty and intentional interference with prospective business advantage.

After answers were filed,[6] Dameshghi led off with his own motion for summary judgment or summary adjudication of the following issues: liability of the broker and escrow defendants for breach of fiduciary duty and liability of Texaco for statutory violation of section 21148, three of the franchise investment law claims, and interference with contract. In addition, summary adjudication of Peet's liability for breach of contract was sought. (Code Civ. Proc., § 437c, subds. (a), (f).)

Both Peet and Texaco and its employees responded by filing their own motions for summary judgment and, in the case of Texaco, for summary adjudication of issues. All motions were set for hearing the same day, which

---

[5]Additional causes of action against Texaco and its employees included intentional misrepresentation and tortious breach of the covenant of good faith and fair dealing. However, Dameshghi has made no specific arguments on appeal regarding those theories, on which summary judgment was also granted. Therefore, Dameshghi has waived any challenges of those rulings on appeal. (*Conner* v. *Dart Transportation Service* (1976) 65 Cal.App.3d 320, 323 [135 Cal.Rptr. 259].)

[6]The broker/escrow defendants also filed a cross-complaint against Texaco for indemnity. Texaco later brought a summary judgment motion on this pleading; the record does not reveal the result, which is in any case a moot point since both Texaco and the broker/escrow defendants prevailed on their respective motions against Dameshghi.

was approximately two months before the scheduled trial date. Extensive deposition testimony and declarations were submitted in support of the various motions.

In granting Texaco's motion for summary judgment, the trial court generally accepted its arguments that the contract between Dameshghi and Peet contained two conditions precedent which never occurred: Texaco's approval of Dameshghi as a franchisee and Texaco's transfer of Peet's three-year lease to Dameshghi. The court thus concluded that the conditions precedent had failed and Texaco had appropriately exercised its statutory right under section 21148 to purchase Peet's business. Peet was found not to have breached his contract with Dameshghi by selling the station to Texaco, and Dameshghi was found to have no enforceable contract rights. The court also ruled the Franchise Investment Law claims (Corp. Code, § 31000 et seq.) were unmeritorious. The court further denied Dameshghi's own motion for summary judgment against the broker/escrow defendants on his cause of action for breach of fiduciary duty, on the ground he had failed to establish as a matter of law that such a breach occurred. The remainder of Dameshghi's motion was also denied.[7]

Dameshghi sought reconsideration of the ruling on summary judgment, on the basis that a factual question still existed regarding whether Texaco had approved the assignment to Dameshghi of Peet's three-year lease. The court denied the motion. (Code Civ. Proc., § 1008.) Summary judgment was entered along with costs in the amount of $6,940.92 to the Texaco group and to Peet.

After the broker/escrow defendants failed to prevail on their own motion for summary judgment against Dameshghi, trial commenced on the remaining causes of action. The trial court issued several rulings on motions *in limine* made by the defendants, establishing that any evidence contrary to the court's order granting summary judgment to Texaco and Peet would be excluded. The court also ruled that any evidence contrary to Dameshghi's pleadings and testimony regarding the unacceptability to him of a one-year lease would be excluded. (See fn. 4, *ante.*) As a matter of contract law, the court found Dameshghi was not a party to the contract on which he sued, due to its execution by his brother on his behalf without a written authorization for that purpose. The court then excluded evidence of damages regarding

---

[7]Dameshghi brought a petition for writ of mandate in this court to overturn the rulings on summary judgment. (*Dameshghi v. Superior Court* (July 10, 1990) D012484 [nonpub. opn.].) The petition was denied on the ground the court was unable to find evidence in the record to show Texaco had ever told Dameshghi or his agent (his brother) that Dameshghi was accepted as a franchisee.

emotional distress or another real estate deal that Dameshghi claimed he had foregone in favor of this investment. Finally, the court ruled defendant Cynthia Tausch could not be held individually liable under the terms of Civil Code section 2343.[8]

Pursuant to stipulation of the parties, the court heard Dameshghi's opening statement made without the presence of a jury for purposes of ruling on the defendant's motion for nonsuit. (Code Civ. Proc., § 581c.) However, neither party waived its right to a jury. At the conclusion of Dameshghi's opening statement, as reopened and supplemented, the trial court granted the motion for nonsuit based on the lack of proximate cause or on the alternative ground that no enforceable contract existed. After motion proceedings under Civil Code section 1717, the trial court made an award of attorney fees and costs to the prevailing broker/escrow defendants in the amount of $88,719.34, of which $80,000 was a reasonable attorney fee. (Code Civ. Proc., §§ 1032, 1032.5.) Judgment was entered accordingly.

Dameshghi has timely appealed the summary judgments in favor of Texaco, its employees, and Peet, and the judgment entered after the nonsuit motion was granted in favor of the broker/escrow defendants, as well as the order imposing attorney fees and costs. These appeals have been consolidated for disposition by this court.

## DISCUSSION

We discuss the issues surrounding the trial court's grant of summary judgment in favor of Texaco, its employees, and Peet in part I, *post*. We first inquire into the nature of the power afforded a franchisor under section 21148, subdivision (a)(5) to purchase a franchise at the same terms and conditions as otherwise agreed by the selling franchisee and a third party, and its effect upon the contractual obligations of the seller. We then decide the scope of entitlement to a private right of action afforded by the Franchise Investment Law (Corp. Code, § 31000 et seq.). In part II, *post*, we shall address Dameshghi's claims that the nonsuit was improvidently granted, as was the motion for attorney fees and costs in favor of the broker/escrow defendants.

---

[8]Civil Code section 2343 reads as follows: "One who assumes to act as an agent is responsible to third persons as a principal for his acts in the course of his agency, in any of the following cases, and in no others: [¶] 1. When, with his consent, credit is given to him personally in a transaction; [¶] 2. When he enters into a written contract in the name of his principal, without believing, in good faith, that he has authority to do so; or [¶] 3. When his acts are wrongful in their nature."

I

■ In deciding the issues of statutory interpretation presented by this record, we follow the rule that "[t]he interpretation of a statute is a question of law, subject to de novo review. (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856].) In construing a statute '[w]e begin with the fundamental rule that a court "should ascertain the intent of the Legislature so as to effectuate the purpose of the law." ' [Citation.]" (*Brown* v. *Superior Court* (1990) 224 Cal.App.3d 989, 992 [274 Cal.Rptr. 442].) We must give effect to the statute according to the usual meaning of the language employed in framing it. (*Ibid.*) " 'If the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history.' [Citation.]" (*Ibid.*) Nevertheless, this "plain meaning" rule does not prevent a court from determining, from the indicia of legislative intent, "whether the literal meaning of a statute comports with its purpose. [Citation.]" (*California Service Station etc. Assn.* v. *Union Oil Co.* (1991) 232 Cal.App.3d 44, 54 [283 Cal.Rptr. 279].)

■ Since Dameshghi's claims against Texaco, its employees, and Peet were disposed of by means of summary judgment, we apply the rule that summary judgments are properly granted "only when the evidence in support of the moving party establishes that there is no issue of fact to be tried. (Code Civ. Proc., § 437c; [citation].)" (*Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 35 [210 Cal.Rptr. 762, 694 P.2d 1134].) " ' "The moving party bears the burden of furnishing supporting documents that establish that the claims of the adverse party are entirely without merit on any legal theory." [Citation.] "The affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of summary judgment should be resolved against granting the motion." [Citation.] ". . . [I]ssue finding rather than issue determination is the pivot upon which the summary judgment law turns." [Citation.]' " (*Bliler* v. *Covenant Control Com.* (1988) 205 Cal.App.3d 18, 23-24 [252 Cal.Rptr. 50].)

Armed with these principles, we examine the merits of Dameshghi's claims.

A

*Franchisor's Power to Purchase Under Section 21148*

Section 21148 is part of the Franchise Dealers Fair Practices Law, section 21140 et seq. Section 21148 sets forth the permissible grounds for a petroleum franchisor's withholding of consent to transfer of a franchise. In pertinent part, section 21148, subdivision (a) provides as follows:

"Notwithstanding the terms of any franchise, a franchisor may not withhold its consent to the sale, transfer, or assignment of the franchise by the franchisee to another person unless the franchisor demonstrates any of the following:

". . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(5) The franchisee has not offered in writing to sell, transfer, or assign the franchise to the franchisor on terms and conditions which are the same as those of the sale, transfer, or assignment of the franchise to the proposed purchaser; and the franchisee has not allowed the franchisor at least 30 days in which to either accept or decline the franchisee's written offer, prior to the sale, transfer, or assignment of the franchise to the proposed purchaser."[9]

Dameshghi interprets section 21148 as merely specifying the conditions under which petroleum franchisors may withhold their consent to the transfer of a franchise. (*Prestin* v. *Mobil Oil Corp.* (9th Cir. 1984) 741 F.2d 268, 272, fn. 5.) He claims the statute was only intended to impose on the franchisor the burden to prove one of the listed grounds to disapprove a transfer, and that on such disapproval, the statute contemplates that the franchise is left in the hands of the existing owner, rather than being purchased by the franchisor pursuant to a "right of first refusal."

In addition, Dameshghi contends that the period of "at least 30 days" specified in the statute for the franchisor's acceptance or refusal of a written offer by the franchisee sets forth an outside limit for any action by the franchisor to purchase a station. He claims that Texaco has waived any rights it had, since its November 11, 1986 notice to Peet that it decided to purchase his station was given more than 30 days after Peet requested it to approve the transfer to Dameshghi (through his letter of October 8, 1986, setting forth the terms of the Dameshghi transaction). Dameshghi alternatively contends that Texaco waived any right it had to purchase the station when it allegedly expressly approved him as a franchisee by approving his credit application, training his brother as station manager at Texaco's training school, and sending him the one-year lease form. Dameshghi thus contends the trial court misinterpreted section 21148 as a matter of law, and that triable issues of fact remain concerning the waiver issue. (Code Civ. Proc., § 437c.)

■ As threshold matters, we note that franchise assignments are properly subject to state, rather than federal, regulation. (*California Service*

[9]Section 21140.4 provides a private right of action to "[a]ny person who is injured in his business or property by reason of a violation of this chapter." This section provides for treble damages and attorney fees and costs to be awarded to a prevailing plaintiff.

*Station etc. Assn.* v. *Union Oil Co., supra,* 232 Cal.App.3d 44, 51-52.) In interpreting such regulation, we are authorized to analyze the "plain meaning" of a statute in conjunction with its legislative history to determine whether the literal meaning of the statute comports with its purpose. (*Id.* at p. 54.)

■ In *California Service Station, supra,* the court concluded that the legislative history of the statute reveals:

"[S]ection 21148 forges a compromise between the competing interests of petroleum franchisors and franchisees. The absolute right of franchisors under prior law to prevent assignment of franchises gave way to the public policy favoring a freer market for petroleum franchises, while protecting the franchisor's ability to insure that the prospective assignee possesses the qualifications to operate the franchise successfully." (*California Service Station etc. Assn.* v. *Union Oil Co., supra,* 232 Cal.App.3d at p. 55.)[10]

Further explanation of the legislative history of section 21148 is found in a letter by the majority floor leader of the Assembly to the Governor, requesting signature of the measure. Floor Leader Willie L. Brown, Jr., explained that the bill would, for the first time, "allow an independent gas station dealer to realize financial reward from the sale, transfer or assignment of the business. The measure does not, however, give carte blanche control to the dealer. [The bill] mandates first option for purchase shall be to the franchisor . . . ."

Analyzing the terms of the statute in this light, we see that, stated in the affirmative, a franchisor may withhold its consent to the transfer, sale, or assignment of a franchise to a third person if the franchisor is able to demonstrate that the current franchisee has failed to offer to sell the franchise back to the franchisor on the same terms and conditions as those of the proposed sale, and the franchisee has failed to allow "at least 30 days" for acceptance or refusal of such a written offer before the sale to the third party. (§ 21148, subd. (a)(5).) Here, the record does not show that Peet ever made an express written offer addressed to Texaco to sell it his franchise, nor did

---

[10]In *California Service Station etc. Assn.* v. *Union Oil Co., supra,* 232 Cal.App.3d at page 56, the court held with reference to section 21148, subdivision (a)(3), that franchisors could not establish "uniformly applied requirements" (*ibid.*) for prospective franchisees which "artificially or unreasonably restrict the franchisee's ability to sell or assign the franchise." (*Id.* at p. 56.) The court concluded that the statutory criteria set forth in section 21148 and its subdivisions (a)(1), (a)(2), and (a)(4) imposed certain controls on a franchisor and prevented unfettered power to control assignments of franchises. An injunction issued against the use of a policy that violated these sections was upheld on appeal, while a related order for attorney fees was reversed. (*California Service Station, supra,* at pp. 56-59.)

he impose any time period for Texaco's consideration of such a purchase. However, at Kirner's request made on behalf of Texaco, Peet requested permission to transfer his franchise and supplied the terms of his agreement with Dameshghi, as part of his efforts to perform that contract. Eventually, Texaco purchased the franchise on the same terms as set by those escrow instructions.

■ It is a well-accepted principle of contract interpretation that "[a]ll applicable laws and ordinances in existence when the agreement is made become a part thereof as fully as if incorporated by reference. [Citations.]" (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 692, pp. 625-626.) For example, in *Fong* v. *Rossi* (1948) 87 Cal.App.2d 20, 22 [195 P.2d 854], a lease was construed as impliedly providing for the transfer of certain licenses in the manner authorized by law. In *Mulder* v. *Casho* (1964) 61 Cal.2d 633, 637 [39 Cal.Rptr. 705, 394 P.2d 545], certain Vehicle Code sections, intended to provide protections to the general public as well as purchasers of vehicles, were held to constitute "implied-in-law terms of every sales contract to which they are applicable" (*ibid.*) and could not be waived or defeated by the parties' agreement. (See also *Silveira* v. *Ohm* (1949) 33 Cal.2d 272, 278 [201 P.2d 387] [a statute was held to be controlling "as if it were expressly included in the terms of the agreement itself. [Citations.]"].)

■ In light of these principles, we apply section 21148, subdivision (a)(5) to these facts. We read the section as creating two statutory entitlements to which the terms of the Dameshghi/Peet contract are necessarily subject: first, a statutory right on the part of Peet to make available the opportunity to his franchisor Texaco to purchase the station on the same terms and conditions as Dameshghi had offered; and second, a statutory right on the part of Texaco to refuse to consent to Peet's proposed transaction with the third party Dameshghi, and a related right in Texaco to make the same deal as was offered to the third party (whether it is denominated an acceptance of Peet's implied offer to Texaco, or a new offer by Texaco to buy, which Peet accepted), since the contractual language did not provide otherwise.

■ We have shown above that the Legislature decided for reasons of public policy to place limitations on a franchisor's power to withhold its consent to the sale, transfer, or assignment of the franchise to another person. (*California Service Station etc. Assn.* v. *Union Oil Co., supra*, 232 Cal.App.3d at p. 55.) Moreover, it appears that the Legislature sought in section 21148 to provide particular protections to the selling franchisee to allow him or her the opportunity to effect a prompt sale of the franchise at market price to the

franchisor, if for some valid reason the franchisor refused to grant consent to the proposed assignment of the existing lease to the third party prospective buyer.

When the statute is read in this manner, it becomes apparent that the rights conferred on the franchisee are for his or her benefit and, accordingly, are subject to waiver.[11] Such an informed waiver could have taken place, for example, if Peet had included language in his agreement with Dameshghi that the sale was intended to be an exclusive opportunity for Dameshghi, to the exclusion of any purchase rights in Texaco, and that if Texaco were to withhold its approval of the transfer of the existing lease (thereby causing a failure of a contingency in the contract), Dameshghi was to be accorded some agreed-upon time to renegotiate the deal and to attempt to obtain the franchisor's approval at a later time. At oral argument on this appeal, Dameshghi's counsel claimed that the existing Peet/Dameshghi contract should be so interpreted; however, the plain language of the contract does not support his contention.

Returning to the statutory language, it seems clear that section 21148, subdivision (a)(5) does not place any requirement on the franchisee/seller to make an express written offer to the franchisor to sell the station to it rather than to the prospective third-party buyer. However, if the franchisee fails to make such an offer in writing to convey the franchise on the same terms and conditions as were offered by the third-party prospective purchaser (in accordance with the terms of § 21148, subd. (a)(5)), it follows that the franchisee may suffer the statutory consequences that the prospective trans-fer may be disapproved by the franchisor, thereby causing delay.

■ Moreover, in some cases (as occurred here), the franchisee may be required to communicate the terms of the proposed third-party deal to the franchisor, as part of the franchisee's best efforts to comply with the terms of the original contract (to obtain approval of the lease assignment). Where the franchisee has not included exclusive-opportunity language in the original agreement with the third party, the franchisee is entitled to place the franchisor on notice of the terms and conditions of such agreement, and thus take advantage of the statutory right under section 21148, subdivision (a)(5) to have a "back-up offer" from the franchisor in place in case the original lease assignment and sale to the third party falls through. We believe this analysis

---

[11]*Mulder* v. *Casho, supra,* 61 Cal.2d 633, 637 is distinguishable in this respect because the statutory provisions that were held in that case to constitute implied-in-law terms of the contract (requirements that brakes be adequately serviced and maintained) were designed to protect the general public as well as the purchaser of a particular vehicle. Section 21148 is not characterized by this public policy purpose and thus is subject to waiver.

is more true to the statutory language than is the "right of first refusal" terminology (not found in the statute) that is used by the parties in their briefs.

Thus, we find no basis to conclude that Peet had any duty to Dameshghi to refuse to exercise his statutory right to obtain a timely sale of his business at market price, whether to Dameshghi or to Texaco. By notifying Texaco of the terms and conditions of the proposed deal with Dameshghi, Peet made an adequate attempt to perform the contract and cannot be held liable for its breach. Accordingly, Dameshghi is not a person "injured in his business or property by reason of a violation of this chapter." (§ 21140.4.) The trial court correctly granted Peet's motion for summary judgment on both the contract and tort theories alleged.

## B

### *Waiver*

Analysis of Texaco's power to purchase the franchise under section 21148 is not complete without a discussion of Dameshghi's waiver claims. Since we have concluded that Peet was not prevented by the terms of the contract from notifying Texaco of the terms of the proposed deal with Dameshghi, we next inquire whether Texaco waived any rights that it had under the statute, either by the passage of time, or by its acts in approving Dameshghi's credit application and training his brother as station manager. (See *Salton Community Services Dist.* v. *Southard* (1967) 256 Cal.App.2d 526, 532-533 [64 Cal.Rptr. 246].)

■ The first issue concerning waiver—waiver by passage of time—is simply dealt with. Section 21148, subdivision (a)(5), provides for a period of "at least 30 days" in which the franchisor may consider whether to accept or decline the franchisee's written offer (express or implied) to purchase the station in place of the proposed purchaser. A period of "at least 30 days" cannot rationally be interpreted to mean "30 days or less," as Dameshghi argues. Here, Texaco notified Peet by letter of November 11, 1986, that it intended to purchase the station in place of Dameshghi, and Dameshghi learned of this purchase through the broker/escrow defendants sometime thereafter. Peet's request for permission to transfer the franchise, and notification of his selling price, occurred just over a month before, on October 8, 1986, and his letter was sent by Kirner to Texaco's Los Angeles offices on October 10, 1986. The actual escrow instructions were sent to Texaco on October 22, 1986. Under any interpretation of a period of "at least 30 days" after the offer is made known to the franchisor, Texaco's action by letter of

November 11, 1986, was expeditious and timely. Although another case might present facts in which the franchisor "sat on its corporate hands," and created prejudice to the parties thereby, this is not such a case.

■ Turning next to the issue of whether Texaco expressly approved Dameshghi as a franchisee, thereby waiving any right it had to purchase the franchise in his stead, we note there is no dispute that Texaco approved Dameshghi's credit application and trained his brother as station manager. However, the evidence also shows that the broker El-Khoury testified that when he called Kirner to notify him that Dameshghi rejected the one-year lease package, Kirner replied that they would "have to send him the whole package that we had, *and he would have to run it by their marketing* and have a different package sent to us." (Italics added.) Kirner had earlier told El-Khoury that marketing department approval was needed for the transfer of a franchise. El-Khoury's most concrete testimony on the state of Texaco's approval of Dameshghi, as relied on in Dameshghi's objections to the proposed order on Texaco's motion for summary judgment, was as follows:

"Q: As you understood the transaction that was going forward, was there a time that you understood that all these steps had been completed?

"A: There was a time when I thought everything would be completed.

"Q: What do you mean by that?

"A: The last conversation during that period of time with Mr. Kirner and escrow gave me the impression everything was under control and we would be able to close escrow in a few days."

The record as a whole shows that the two acts of approval on which Dameshghi relies were not all that was required, and there is no triable material issue of fact remaining as to any actual approval of Dameshghi as a franchisee. The evidence is undisputed that the transaction never got that far.[12]

In any case, neither of the acts that Texaco performed, i.e., approving Dameshghi's credit or training his brother, constituted a waiver by Texaco of its right under appropriate circumstances to enter into a one-year lease as a

---

[12]Dameshghi's expert's declaration to the contrary (submitted in opposition to the summary judgment motions), in which attorney Guy Gilbert declares that he "assisted in transactions in which Texaco has consented to assignments of franchise agreements when the purchaser is approved by its Credit Department and has successfully completed Texaco dealer training school," does not raise triable issues of fact as to whether those were the only conditions required for the approval of this Texaco franchise transfer.

trial period, rather than a three-year lease, such as the existing dealer Peet had. (See *California Service Station etc. Assn.* v. *Union Oil Co.*, *supra*, 232 Cal.App.3d 44, 50-56; 15 U.S.C. § 2801 et seq., the Petroleum Marketing Practices Act.) Texaco's actions in pursuing the one-year trial arrangement with Dameshghi were not inconsistent with its disapproval of Dameshghi as a three-year franchisee. No implicit waiver of its rights under section 21148, subdivision (a)(5) can thus be found on this record. (*Salton Community Services Dist.* v. *Southard*, *supra*, 256 Cal.App.2d 526, 532-533.)

■ Moreover, to the extent that Dameshghi alleges that Texaco breached an oral contract to tender and enter into a three-year lease, such contention runs afoul of the statute of frauds. (Civ. Code, § 1624, subd. (c); Code Civ. Proc., § 1971.)

■ In conclusion on the summary judgment issues concerning section 21148, we address Dameshghi's claim that the trial court abused its discretion in denying his motion for reconsideration on the ground that triable issues of fact remained as to whether Texaco had ever approved Dameshghi as its franchisee. (*Corns* v. *Miller* (1986) 181 Cal.App.3d 195, 201-202 [226 Cal.Rptr. 247].) At the reconsideration hearing, Dameshghi argued that Texaco had led El-Khoury to believe that Texaco had or would approve Dameshghi's purchase of the franchise. Examination of the testimony of El-Khoury and Kirner discloses that Kirner consistently told El-Khoury that approval of the assignment would have to come from Texaco's marketing department, which never occurred. El-Khoury's "impression everything was under control" does not constitute hard evidence that approval was given, and argument of counsel to that effect, on which Damesghi relies, is not evidence. The trial court had the discretion to evaluate the showing made of the "alleged different state of facts" (Code Civ. Proc., § 1008, subd. (a)), and concluded that Dameshghi's showing that he was entitled to reconsideration was inadequate. No abuse of discretion is apparent on this record. The uncontroverted evidence entitled Texaco to summary judgment in the first instance and upon reconsideration.

## C

### *Franchise Investment Law Claims*

The Franchise Investment Law (Corp. Code, § 31000 et seq.) prohibits, among other things, false or misleading disclosures made in connection with the offer of sale of a franchise. Dameshghi's complaint pleads several claims that Texaco failed to supply him with the documentation required under the Franchise Investment Law, such as a franchise offering circular (Corp. Code, § 31119), and documentation of an exemption from the franchise registration requirements (Corp. Code, §§ 31101, subd. (d), 31114, 31110). The complaint further alleges that Texaco falsely communicated to Dameshghi that he was approved to become a franchisee. (Corp. Code, § 31201.)

At the motion for summary judgment, Texaco's arguments with respect to the Franchise Investment Law claims were confined to Dameshghi's lack of standing to assert such claims. The trial court evidently agreed, and granted the motion as to those causes of action. Dameshghi makes several claims of error as to this ruling: the trial court did not entertain oral argument on those issues, and Dameshghi is not sure if the court considered them; and even if Dameshghi lacks standing to sue, Texaco is estopped by its own acts from denying that standing exists. (*Don Rose Oil Co., Inc.* v. *Lindsley* (1984) 160 Cal.App.3d 752, 759 [206 Cal.Rptr. 670]; *San Diego Mun. Credit Union* v. *Smith* (1986) 176 Cal.App.3d 919, 923 [222 Cal.Rptr. 467].)

Both of Dameshghi's claims on this point are without merit. ▮ First, in reviewing a judgment, all intendments and presumptions are in its favor, and we do not inquire into the trial court's reasoning behind that judgment. (*Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P.117].) ▮ Code of Civil Procedure section 437c, the summary judgment statute, does not require the court to issue a statement of decision when granting a motion and, although the trial court initially agreed to prepare one, none was ever completed. Complete orders and judgment were issued and we review their substance.

▮ Moving to the merits of Dameshghi's claim, we first note that Corporations Code section 31006 defines a franchisee as "a person to whom a franchise is granted." The section providing for a private civil right of action, Corporations Code section 31300, provides in pertinent part as follows:

"Any person who offers or sells, a franchise in violation of Section 31101, 31110, 31119, 31200, or 31202, shall be liable *to the franchisee or subfranchisor*, who may sue for damages caused thereby, and if such violation is willful, the franchisee may also sue for rescission . . . ." (Italics added.)

Evidently, the Legislature intended to grant standing to sue for violations of the Franchise Investment Law to franchisees or subfranchisors, neither of which fairly describes Dameshghi. Citing *Don Rose Oil Co., Inc.* v. *Lindsley, supra*, 160 Cal.App.3d 752, 759, Dameshghi argues that he should not be denied access to the courts to enforce his claim that the alleged misrepresentations were made.[13] Since it is clear as a matter of law that Dameshghi never became a "franchisee" within the meaning of Corporations Code section 31006, and since the Legislature declined to define a franchisee as including a "prospective" franchisee, we believe Dameshghi's argument is

---

[13]In *Don Rose Oil Co., Inc.* v. *Lindsley, supra*, 160 Cal.App.3d 752, 759, the court held a prospective assignee of a contract was entitled to standing to enforce the contract provision regarding assignment, which was conditioned upon consent by a petroleum franchisor. Noting that the trend in the law is toward the assignability of contract rights (*Cohen* v. *Ratinoff* (1983)

not well taken that he must be entitled to access to the courts to redress allegedly misleading "offerings" of a franchise. Moreover, we do not believe that Texaco's acts in submitting the one-year trial lease documents to Dameshghi for his consideration should constitute an estoppel against any statutory argument it might make regarding standing under the Franchise Investment Law. (*San Diego Mun. Credit Union* v. *Smith, supra,* 176 Cal.App.3d 919, 923.)

We further question whether Damesghi's transaction with Peet, in which Texaco was initially a peripheral player, should properly be considered to be the kind of direct contact between franchisor and franchisee that is regulated by the Franchise Investment Law. (See *Neptune Society Corp.* v. *Longanecker* (1987) 194 Cal.App.3d 1233, 1244 [240 Cal.Rptr. 117]; *Dollar Systems* v. *Avcar Leasing Systems* (9th Cir. 1989) 890 F.2d 165, 172-173.) The Dameshghi-Peet transaction did not involve any payment directly to Texaco, since Peet sought to assign an existing lease and franchise. Texaco never directly offered to sell Dameshghi a franchise for value; as planned, the transaction required the transfer of the lease by Texaco without separate consideration, pursuant to an approved assignment (which never occurred). Dameshghi has pled no facts showing he incurred damage due to the alleged misrepresentations. In any case, we conclude the statutory definition of franchisee (Corp. Code, § 31006), in combination with the limitations on a private civil right of action contained in Corporations Code section 31300, are dispositive of Dameshghi's Franchise Investment Law claims.

## II

### A

#### *Proximate Cause Issue*

In reviewing Dameshghi's claims that the trial court erred in granting the broker/escrow defendants' motion for nonsuit, we apply the standard set out by the Supreme Court in *Cervantez* v. *J. C. Penney Co.* (1979) 24 Cal.3d 579, 593 [156 Cal.Rptr. 198, 595 P.2d 975]:

"A nonsuit may be granted only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled,

---

147 Cal.App.3d 321 [195 Cal.Rptr. 84]; *Prestin* v. *Mobil Oil Corp., supra,* 741 F.2d 268), the court found it was unreasonable and outrageous for the franchisor to contend that because of the conditional nature of the assignment, the prospective assignee could not sue it without its consent. However convincing such a viewpoint may be where common law contract issues are concerned, where specific statutes have been enacted granting a private right of action and defining those who are entitled to enforce such a right (e.g., Corp. Code, §§ 31300, 31006), we believe the statutory language must control.

indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff."

■ A trial court may properly grant a motion for nonsuit under Code of Civil Procedure section 581c immediately after the completion of the plaintiff's opening statement, "where it appears that counsel for the plaintiff has stated all the facts that he expects to prove and that these would not make a prima facie case. [Citations.]" (*John Norton Farms, Inc.* v. *Todagco* (1981) 124 Cal.App.3d 149, 160 [177 Cal.Rptr. 215].)

Dameshghi argues that his opening statement made out a sufficient case against the broker/escrow defendants on his theories of negligence, negligent misrepresentation, breach of fiduciary duty, and interference with prospective advantage. He bases his claim that nonsuit should not have been granted on several theories: first, the conduct of the broker/escrow defendants should be actionable independent of Texaco's lack of liability and the grant of summary judgment in its favor; his reasoning is that the broker/escrow defendants' delay in sending the escrow documents to Texaco allowed it the extra time it needed to assert a right to buy the station, thus allegedly causing Dameshghi injury and damage by allowing the sale to Texaco to take place. In addition, Dameshghi argues the broker/escrow defendants provided deficient information about what would happen if Dameshghi refused to sign the one-year lease and insisted upon a three-year lease being provided. Breach of fiduciary duties is then claimed through the "secret amendment" of the escrow documents. A further "actionable omission" by the broker/escrow defendants is also alleged: their failure to prepare a power of attorney document to enable Dameshghi's brother to sign the escrow documents on his behalf without any possibility of challenge to the brother's authority to do so. Dameshghi thus claims on this point that the broker/escrow defendants should not be able to use their own negligence to deny liability.

In its ruling granting nonsuit on these claims, the trial court stated:

"A necessary element in all . . . causes of action is that the negligence or the actions of the defendants complained of or their inactions complained of caused injury . . . to the plaintiff, and there is no evidence referred to in the opening statement of causation." The court continued, "[T]he bottom line is that there is no evidence of causation referred to, in any way, in the opening statement, and as a result, the motion for nonsuit is well-taken and it is granted."

■ The chief issue inherent in all of Dameshghi's claims against the broker/escrow defendants is the presence or absence of proximate causation.

(See *Mitchell* v. *Gonzales* (1991) 54 Cal.3d 1041 [1 Cal.Rptr.2d 913, 819 P.2d 872].) Dameshghi's underlying assumption in his opening statement and on appeal is that Texaco exercised a "right of first refusal" to which it was not entitled. We have discussed the error of that assumption in part I, *ante*. Moreover, assuming that the proper analysis of the proximate cause issue to be applied here is the standard of BAJI No. 3.75,[14] which inquires whether a cause "in natural and continuous sequence, produces the [injury] . . . and without which the [injury] . . . would not have occurred," we find no reference in the opening statement to evidence that Dameshghi planned to produce at trial that would have created a valid issue for the jury's determination regarding the broker/escrow defendants' activities as a cause in fact of his alleged injury and damage. (See *Mitchell* v. *Gonzales, supra,* 54 Cal.3d 1041, 1044, fn. 2.)

Even assuming that the correct analysis, as newly explained by the Supreme Court in *Mitchell* v. *Gonzales, supra,* 54 Cal.3d 1041 is the legal cause or "substantial factor" test found in BAJI No. 3.76 (which asks whether the defendant's conduct was a substantial factor in bringing about the injury), we conclude the trial court correctly evaluated Dameshghi's opening statement as failing to make a showing that the broker/escrow defendants' conduct was a substantial factor in bringing about Dameshghi's alleged injuries. Dameshghi cannot show he suffered actual harm proximately caused by these defendants. (*Gagne* v. *Bertran* (1954) 43 Cal.2d 481, 490 [275 P.2d 15].) Since Texaco and Peet were entitled by statute to take the actions that they did, there is no causal nexus between Dameshghi's alleged injury and the acts of the broker/escrow defendants. No independent basis for liability on their part exists, and nonsuit was properly entered in their favor on the causation issue.

Our disposition of Dameshghi's chief claim regarding the nonsuit makes it unnecessary for us to address his arguments regarding the equal dignities rule. (*Ellis* v. *Mihelis, supra,* 60 Cal.2d 206, 210.)[15] ▮▮▮▮ We also need not address his claims that the trial court abused its discretion by

---

[14]The text of BAJI No. 3.75, the "but for" instruction reads: "A proximate cause of injury, damage, loss or harm is a cause which, in natural and continuous sequence, produces the injury, damage, loss or harm and without which the injury, damage, loss or harm would not have occurred." As explained in *Mitchell* v. *Gonzales, supra,* 54 Cal.3d 1041, 1044 at footnote 2, this instruction actually covers the subject of cause in fact, as does No. 3.76, despite the use of the terms proximate cause and legal cause.

All BAJI instructions referred to are from the bound volume of the seventh edition (1986) unless otherwise noted.

[15]We assume here, as do respondents in their brief, that there was a valid contingent contract between Dameshghi and Peet, notwithstanding its signature on Dameshghi's behalf by his brother. Any error on the trial court's part in finding Dameshghi was not a party to the

refusing to hear certain testimony that Dameshghi wished to offer.[16] It is also unnecessary in light of our affirmance of the nonsuit ruling to address the trial court's conclusions concerning the lack of personal liability of the escrow officer Cynthia Tausch. (Civ. Code, § 2343.)

B

*Attorney Fees*

Dameshghi raises two challenges to the trial court's award of attorney fees and costs to the broker/escrow defendants: the trial court acted prematurely in making the award to the "prevailing parties," since Dameshghi had a month beforehand filed a notice of appeal to challenge the order granting nonsuit; and the trial court erred in awarding fees to an attorney-litigant, defendant escrow officer Cynthia Tausch.

In support of his claim there is no "prevailing party" entitled to any award of fees pending the determination of this appeal, Dameshghi relies on *Mabee v. Nurseryland Garden Centers, Inc.* (1979) 88 Cal.App.3d 420 [152 Cal.Rptr. 31]. There this court found that the effect of a motion for judgment notwithstanding the verdict and a motion for new trial was to hold in abeyance the determination of a prevailing party, and the notice of appeal similarly placed a "question mark" on the status of the plaintiff as prevailing party, thus making any fees award premature. We stated: "Only when this court's judgment became final could it be stated that [plaintiff] was the 'prevailing party'; therefore, entitled to attorney fees. [Citations.]" (*Id.* at p. 430.)

*Mabee v. Nurseryland Garden Centers, Inc., supra,* 88 Cal.App.3d 420, has been cited for the proposition that the trial court has the jurisdiction to determine costs and attorney fees after judgment. (*Raisola* v. *Flower Street*

---

contract at all was harmless in light of its other, dispositive ruling on the proximate cause issue.

[16]Dameshghi's position on appeal, that he should have been able to testify that he would have signed the one-year lease and later sought a three-year lease if he had known that the papers would otherwise be rejected in total by Texaco, is framed as a claim that the trial court abused its discretion in disallowing him leave to amend the pleading at the time of trial. (*Del Mar Beach Club Owners Assn.* v. *Imperial Contracting Co.* (1981) 123 Cal.App.3d 898 [176 Cal.Rptr. 886, 25 A.L.R.4th 336].) The issue of Dameshghi's wishes concerning the one-year and three-year leases had already been thoroughly litigated in the summary judgment proceedings concerning Texaco and Peet, and was further discussed in Dameshghi's opening statement. The trial court did not abuse its discretion in finding unpersuasive Dameshghi's declaration to this effect, which contrasted with his earlier deposition testimony that he rejected a one-year lease. There was no abuse of discretion here. (See *Kerr* v. *Rose* (1990) 216 Cal.App.3d 1551, 1562-1563 [265 Cal.Rptr. 597].)

*Ltd.* (1988) 205 Cal.App.3d 1004, 1007 [252 Cal.Rptr. 726].) In *Presley of Southern California v. Whelan* (1983) 146 Cal.App.3d 959, 961 [196 Cal.Rptr. 1], this court, citing *Mabee,* made the general comment that an attorney fees award under Civil Code section 1717 "must wait until the lawsuit is completely and finally decided," which was not the case where only an interim procedural victory had been obtained (reversal on appeal of a summary judgment granted by the trial court). (*Presley, supra,* at pp. 961-963.) In *Encinitas Plaza Real v. Knight* (1989) 209 Cal.App.3d 996, 999, footnote 4 [257 Cal.Rptr. 646], this court again relied on *Mabee* for the rule that "[t]here is no requirement that an award of attorney's fees be made before entry of judgment. The right to fees under a contract must be pleaded and proved, but if the prevailing party cannot be finally determined before entry of judgment, fees may be awarded in a postjudgment hearing, either by amendment of the judgment or by an order on a collateral matter after judgment."

■ In light of the evident acceptance of *Mabee v. Nurseryland Garden Centers, Inc., supra,* 88 Cal.App.3d 420, on these and other points, we believe that the particular language relied on by Dameshghi (quoted *ante* at p. 1288) is potentially misleading if taken out of context and requires clarification here. It must first be noted that under Code of Civil Procedure section 904.1, subdivision (b), an order made after an appealable judgment is separately appealable as a final determination on a collateral matter, which is severable from the general subject matter of the litigation. (*Associated Convalescent Enterprises v. Carl Marks & Co., Inc.* (1973) 33 Cal.App.3d 116, 120 [108 Cal.Rptr. 782]; also see *Commercial & Farmers Nat. Bank v. Edwards* (1979) 91 Cal.App.3d 699, 702 [154 Cal.Rptr. 345], and 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 45-48, pp. 69-74.) Such a rule presupposes that the trial court retains jurisdiction to decide the collateral matter of entitlement to contractual attorney fees, even after the main action is resolved by final order or judgment and a notice of appeal is then filed of such order or judgment.

Similarly, under Civil Code section 1717, subdivision (b)(1), the trial court is accorded the power, on notice and motion, to "determine who is the party prevailing on the contract for purposes of [section 1717], whether or not the suit proceeds to final judgment." Civil Code section 1717, subdivision (a) expressly defines reasonable attorney fees awarded under the section as an element of the costs of suit.

Thus, there is no question here that the notice of appeal of the judgment of nonsuit did not deprive the trial court of the power to proceed to determine the ancillary matter of contractual attorney fees as part of the costs due to

the prevailing party. Any other rule would add needless delay by reserving such costs determinations until after appeal, an undesirable result. We therefore limit the authority of *Mabee* on this procedural point to the peculiar facts there recited.

All that being said, however, a further issue concerning attorney fees remains to be addressed. The trial court's order on its face included defendant Cynthia Tausch, an attorney, in the award of fees to the broker/escrow defendants, of which she was one. Dameshghi cites *City of Long Beach* v. *Sten* (1929) 206 Cal. 473, 474 [274 P. 968], and *O'Connell* v. *Zimmerman* (1958) 157 Cal.App.2d 330, 337 [321 P.2d 161], for the proposition that an attorney representing himself or herself in an action may not recover the reasonable value of his or her fee, having paid no fee nor having incurred any liability to pay an attorney fee.[17] Dameshghi thus requests that any attorney fee award must exclude fees claimed by defendant and attorney Tausch for representing herself. In the respondent's brief, no opposition is asserted to this argument, the defendants merely asserting that the attorney fees issue is derivative in toto of the substantive legal issues.

In *Renfrew* v. *Loysen* (1985) 175 Cal.App.3d 1105, 1109-1110 [222 Cal. Rptr. 413], the court noted that under similar circumstances, where an attorney represents herself in litigation, she is required to utilize professional time and skill which would have otherwise been available for her regular law practice. The court stated that to allow a losing party to escape an obligation to pay attorney fees required under a contract, "simply because the attorney chose to rely on her own professional skill rather than hire another attorney would create a windfall for the client at the direct and tangible expense of the prevailing party-attorney." (*Id.* at p. 1109.) Concluding that the determination of what constitutes reasonable attorney fees is committed to the discretion of the trial court, the court reversed an order denying attorney fees to the attorney-litigant and remanded the case to the trial court for further proceedings. (Accord, *Leaf* v. *City of San Mateo* (1984) 150 Cal.App.3d 1184, 1187-1189 [198 Cal.Rptr. 447].)

 In this case, the award of attorney fees does not segregate the amount due to Cynthia Tausch from the amounts due to the broker/escrow defendants as a whole. The court substantially reduced the amount of fees originally requested by these defendants ($61,112.50 by Tausch and $128,569.32 by cocounsel) in making its award of $80,000 attorney fees to

---

[17]In *Consumers Lobby Against Monopolies* v. *Public Utilities Com.* (1979) 25 Cal.3d 891, 914-915 [160 Cal.Rptr. 124, 603 P.2d 41], the Supreme Court relaxed the strictness of the rule in *City of Long Beach* v. *Sten, supra*, 206 Cal. 473, and allowed an attorney acting pro se to recover attorney fees as part of an award under the common fund doctrine.

these defendants as a group. We decline to find such conduct by the trial court was an abuse of discretion and conclude that Dameshghi has made an insufficient showing that Tausch is not entitled to some portion of those fees, consistent with the face of the minute order.

No request for contractual attorney fees on appeal has been made in the briefs and none shall be awarded.[18]

### DISPOSITION

The judgments and order are affirmed.

Kremer, P. J., and Work, J., concurred.

A petition for a rehearing was denied March 13, 1992, and appellant's petition for review by the Supreme Court was denied May 13, 1992.

---

[18]At oral argument, the attorney representing the broker/escrow defendants requested for the first time in these proceedings an award of attorney fees on appeal. (Civ. Code, § 1717.) Dameshghi had no notice and no opportunity to respond to that request. Accordingly, we treat the matter of attorney fees on appeal as waived. (*Mann* v. *Cracchiolo, supra,* 38 Cal.3d 18, 41.)