Filed 4/15/26; Modified and Certified for Pub. 5/14/26 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| LEVON NARGIZYAN,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>STATE FARM GENERAL<br>INSURANCE COMPANY,<br><br>    Defendant and Respondent. | B342340<br>(Los Angeles County<br>Super. Ct. No. 21STCV32834) |

    APPEAL from a judgment of the Superior Court of Los Angeles County, Lia Martin, Judge. Reversed and remanded with directions.

    Law Offices of Regina Spurley and Regina Spurley for Plaintiff and Appellant.

    Musick, Peeler & Garrett, Steven J. Elie, Cheryl A. Orr, and Donald E. Bradley for Defendant and Respondent.

    Merlin Law Group, Victor Jacobellis, and Daniel J. Veroff; Law Eagles and Eric D. Townsend for United Policyholders as Amicus Curiae on behalf of Plaintiff and Appellant.

————————————

Levon Nargizyan filed a claim under his homeowners insurance policy after discovering water leaking from a hot water pipe underneath his kitchen floor. Following its investigation, State Farm General Insurance Company denied the claim, determining it was based on loss caused by "continuous or repeated seepage or leakage" of water from a plumbing system and thus excluded from coverage under the policy.

Nargizyan sued State Farm for breach of contract, breach of the covenant of good faith and fair dealing, and unfair business practices in violation of the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200). State Farm moved for summary judgment or, in the alternative, summary adjudication on Nargizyan's implied covenant and punitive damages claims. The superior court granted State Farm's motion for summary judgment. Because triable issues of material fact remain, we reverse the grant of summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Nargizyan's Water Damage Event*

On June 6, 2020, Nargizyan noticed tiles on his kitchen floor were warmer than usual. Upon inspection, Nargizyan saw water dripping from the top of the crawl space under the house. Nargizyan testified at his deposition that water was "dripping in different places" with "faster drips," but "not pouring like a faucet." He stated there were too many places to count where water was dripping and there "was just water all over the place."

Nargizyan called a plumber, who, on either June 6 or 7, discovered the water was coming from a hot water pipe in the crawl space. The plumber explained to Nargizyan that water was spraying up out of the pipe, soaking both the insulation and the

2

wood and tile flooring above the crawl space. The plumber removed the broken piece of pipe, which Nargizyan retained, and replaced it, which stopped the leak.

On June 8, Nargizyan called a contractor, ServPro, to begin the process of cleaning up and assessing any damage.

On June 9, Nargizyan reported his water loss claim to State Farm.

B.    *The Insurance Policy, Claim, and Investigation*

Nargizyan's homeowners policy from State Farm provided coverage for "accidental direct physical loss" to the dwelling and personal property. The policy excluded from coverage numerous "losses not insured," including any loss caused by "Water, meaning," among other things, "continuous or repeated seepage or leakage of water or steam from a . . . plumbing system, including from, within or around any . . . plumbing fixture, including their walls, ceilings or floors," "regardless of whether the event occurs suddenly or gradually, involves isolated or widespread damage, [or] arises from natural or external forces."

On June 10, Nargizyan notified a State Farm representative that a hot water pipe had "burst" under the kitchen floor in his home. The representative indicated State Farm needed to speak to the plumber who repaired the pipe to determine whether coverage would be provided.

On June 12, a State Farm claim specialist, Jennifer Gilman, left a message for the plumber but received no return call. Gilman also spoke to Marat Koshkaryan at ServPro, who informed Gilman that a hot water pipe had "burst" in the crawl space, apparently at a t-connection where there was calcium buildup on the pipe. Koshkaryan reported discovering about one

3

and three-fourths inches of hot water in the crawl space, explaining further that the insulation, wooden joists, and plywood subfloor were saturated and marble tiles in the kitchen were discolored. Koshkaryan indicated the tiles, subfloor, and cement in the kitchen, as well as the hardwood floor in the adjacent living room, would have to be removed and replaced.

On June 15, State Farm received photographs from ServPro and notified Nargizyan it was reserving its rights as to his claim.

On June 19, Gilman interviewed Nargizyan about the loss and stated that the photographs showed a failed pipe and evidence of possible continuous or repeated seepage or leakage of water. Gilman also requested that the plumber provide an invoice and report for review. Nargizyan disputed Gilman's assessment and requested a physical inspection.

On June 24, a State Farm claim specialist, John Foster, inspected the house, with Nargizyan and Koshkaryan present. In notes from the inspection, Foster observed: (1) "a pipe below the raised foundation burst and sprayed water upward into the framing which was absorbed by the insulation"; (2) "cause of loss appears to be wear/tear/and deterioration"; (3) the pipe had a "buildup of limescale" and black compression repair tape "that gave way and allowed water to start spraying out"; (4) Nargizyan provided a video showing water "spraying out at a rapid rate," assuming "more than 3 cups a minute." Under a section titled "Determination of Coverage," the notes indicate: "Does not appear to be [continuous or repeated leakage or seepage]. The video shows the water coming out a rapid rate. The policy provides coverage for resulting damage." The notes further indicate the scope of damage was not yet certain, with a question

4

as to whether flooring in the kitchen was affected by the water. Foster recommended hiring a flooring specialist to evaluate and make a determination as to coverage.

On June 30, a State Farm claim specialist, Jazmin Ramos, sent Nargizyan an email stating, "It looks like based on the inspection[, c]overage was extended for the repairs needed and the cleanup." However, State Farm's investigation remained active and subject to the reservation of rights. Ramos noted State Farm was still waiting for ServPro to submit an estimate and photos.

On July 13, State Farm requested estimates and additional claim information from Nargizyan. On July 17, State Farm received a letter of representation from a public adjuster, William Musakhanyan, whom Nargizyan had retained. On July 20 and 22, State Farm communicated with Musakhanyan regarding the claim.

On August 6, an engineering firm retained by State Farm, 4X Forensic Engineering Laboratories (4X Forensic), inspected the broken piece of pipe to determine the cause of loss. Musakhanyan was present for the inspection.

On August 18, 4X Forensic issued a report authored by an engineer, Bruce Agle, with a stated objective of determining "the cause of the leak." The report concluded the pipe had been leaking through a pinhole perforation that was "most likely" caused by a screw or nail puncture. The report opined "there would have been no leakage or minor leakage initially, that over time would have increased as the screw or nail corroded." The pinhole was in a recessed area of the pipe adjacent to electrical tape and abrasion on the surface of the pipe. The report concluded "[t]he most reasonable cause of failure based on

physical evidence is someone ground down the surface to get good electrical contact," and that "[a] sharp object, such as [a] screw, perforated the tube." The report explained and included photographs showing the pipe was releasing water in a "spray leak from the pinhole perforation" at a rate of 0.3 gallons per minute when tested with a water pressure of 65 pounds per square inch.

On September 11, State Farm informed Nargizyan that it was denying his claim because the damage was caused by faulty workmanship that resulted in continuous or repeated seepage or leakage and thus was excluded from coverage. State Farm's denial letter indicated Nargizyan should contact State Farm if he had any additional information regarding the claim that had not been considered.

That day, Musakhanyan asked for a copy of the 4X Forensic report and to speak further with State Farm on the matter. Gilman spoke with Musakhanyan, advising him of the report and denial letter and indicating State Farm would review any new information regarding the claim that it received. The next day, Gilman emailed Musakhanyan a copy of the report and letter.

On September 23, Musakhanyan emailed Agle, challenging his conclusion in the report that the pinhole was caused by a screw or nail perforation. Specifically, Musakhanyan explained that inspection of the crawl space revealed no screw, nail, or other sharp object that could have perforated the pipe and no nearby electrical wiring that would indicate electrical grounding was needed. Musakhanyan noted photographs in 4X Forensic's report of its examination of the broken piece of pipe did not contain signs consistent with such a perforation, including

6

"bulging, tear or chipping on the inside of the [pipe]." Musakhanyan also questioned why the report described a 0.3 gallon per minute release rate when Agle had stated the rate was 2.3 gallons per minute during the inspection, as confirmed by a video of the inspection that Musakhanyan had recorded.

On October 29, Gilman spoke to Agle, who confirmed he reviewed Musakhanyan's email and that it did not change his conclusions in the report. Later that day, Gilman spoke to Musakhanyan and advised him of Agle's update, offered to conduct a conference call with Agle (which Musakhanyan declined), and declined Musakhanyan's request to speak to Agle without State Farm present. Musakhanyan accused Gilman and State Farm of directing Agle to come to his conclusions and indicated Nargizyan would be filing a lawsuit.

On November 10, Gilman sent a further denial letter to Musakhanyan that stated State Farm's coverage position had not changed.

C.  *The Lawsuit*

In September 2021, Nargizyan filed a complaint against State Farm, alleging the insurer unreasonably delayed and withheld benefits and payments under the policy despite knowing his water loss claim to be valid. Nargizyan alleged causes of action for breach of contract, breach of the covenant of good faith and fair dealing, and unfair business practices in violation of the UCL.[1] For his good faith and fair dealing cause of action, Nargizyan sought punitive damages, among other relief.

---

[1]     Nargizyan also brought a claim of intentional infliction of emotional distress against Gilman, in her individual capacity,

7

D.     *State Farm's Motion for Summary Judgment or Summary Adjudication*

In December 2023, State Farm moved for summary judgment or, in the alternative, for summary adjudication on Nargizyan's claims for breach of the implied covenant and punitive damages.[2]  State Farm argued it did not breach the policy and instead properly denied Nargizyan's claim as excluded loss caused by continuous or repeated seepage or leakage of water from a plumbing system.  State Farm asserted undisputed evidence showed the water loss was caused by a pinhole leak from a screw or nail puncture of a plumbing pipe that "was not a sudden, catastrophic event" but rather a leak that "had developed over time and eventually progressed to the point when [Nargizyan] noticed the warming in the tile floor and discovered the leak, which at that point had begun spraying hot water." State Farm also argued that, without a policy breach, Nargizyan could not prove his breach of the covenant of good faith and fair dealing and UCL causes of action.

On the breach of the covenant of good faith and fair dealing cause of action, State Farm asserted it had conducted a full and fair investigation on Nargizyan's claim and there was at least a

---

who Nargizyan alleged had "order[ed] [4X Forensic] to fabricate and manipulate the report and findings on the cause of loss" and "blocked the vendor from discussing the findings with Plaintiff and his representatives, causing the damages to the house to continue being in a state of disrepair."  Nargizyan later dismissed Gilman from the action without prejudice.

[2]     State Farm did not move for summary adjudication of Nargizyan's UCL cause of action.

8

"genuine dispute" as to coverage such that its denial of the claim was not unreasonable. State Farm contended summary adjudication of Nargizyan's claim for punitive damages was proper because there was no clear and convincing evidence showing State Farm acted with oppression, fraud, or malice and no evidence that any such conduct was ratified by a State Farm officer, director, or managing agent.

In support of its motion, State Farm submitted a declaration from Donna Blazewich, the State Farm claims team manager who supervised the handling of Nargizyan's claim, as well as the 4X Forensic report and excerpts from Nargizyan's deposition, among other evidence.

E.    *Nargizyan's Opposition*

Nargizyan opposed State Farm's motion. He acknowledged the water loss was caused by a pinhole leak in a hot water pipe. He argued, however, that State Farm had not presented undisputed evidence establishing that water had discharged from the pinhole "over a long period of time" such that it constituted "continuous or repeated seepage or leakage" under the policy exclusion. He asserted evidence instead showed he had immediately addressed the discharging water upon first discovering it through the warm kitchen tiles, and he pointed to the lack of evidence such as mold and pooling water in the crawl space that would demonstrate a long-term leak. Nargizyan also argued his policy did not define any of the terms used in the continuous or repeated seepage or leakage exclusion, nor did it provide any temporal threshold or other concrete data points for the exclusion to apply. As a result, Nargizyan asserted, the exclusion's application was "totally arbitrary." Nargizyan

contended this was intentional and that State Farm had enacted a "Water Initiative" in which it directed its adjusters to "make the facts of the loss fit the . . . exclusion, regardless of whether it is legitimate."

Nargizyan argued that State Farm's failure to conduct a prompt, fair, and thorough investigation defeated its "genuine dispute" theory and showed triable issues remained on his breach of the covenant of good faith and fair dealing cause of action. Nargizyan pointed to shifting coverage positions he received from State Farm representatives during the course of its investigation and argued this was evidence of State Farm arbitrarily implementing its Water Initiative to deny his claim. Nargizyan also argued that 4X Forensic was biased based on its extensive history of being retained by State Farm. He further asserted that 4X Forensic's inspection of the pipe was incomplete and its conclusions lacked factual foundation, noting 4X Forensic never proved that a screw or nail caused the pinhole and never considered other possible causes of the leak (such as a chemical reaction) or determined or estimated how long water had actually been discharging from the pipe. As to his punitive damages claim, Nargizyan asserted State Farm ignored the issues he and his public adjuster had raised and failed to conduct a full investigation. He argued that Blazewich committed or ratified all the wrongful conduct as the claims team manager overseeing his claim.

Nargizyan supported his opposition with a video he recorded of the leaking pipe upon his initial discovery of the leak and excerpts from his deposition as well as those of State Farm personnel and the 4X Forensic engineer who inspected the pipe (Agle). Nargizyan emphasized Agle's deposition testimony that,

10

despite concluding in his report that the leak developed "over time" as the pipe-puncturing screw or nail corroded, he did not know when the leak started, how long it existed, or at what rate (or rates) water had previously released from the pipe as the leak developed. Agle testified he "can't even estimate" how long the pipe had been discharging water.

Nargizyan also submitted a declaration from a mechanical engineer, Richard Mumper, who disputed 4X Forensic's conclusion that the pinhole was caused by a screw or nail puncture and cited a chemical reaction on the surface of the pipe as another potential cause for the pinhole that was supported by 4X Forensic's photographs of the pipe showing "a serpentine line running in a latitudinal direction immediately adjacent to the hole that is an indicator of chemical etching." Mumper explained 4X Forensic's only proof of a screw or nail puncture was the "somewhat circular shape" of the pinhole, adding its report did not cite any evidence that there were screws or nails in the area where the pinhole developed. Mumper also noted 4X Forensic's photographs of the inside of the pipe did not show "mechanical inward deformation" or a "burr on the inside on the circumference of the hole," thus indicating there was "no forced puncture." Mumper emphasized that 4X Forensic's report did not show it investigated or ruled out the possibility of a chemical reaction nor did it perform a site inspection or destructive testing to rule out other possible causes. Mumper further stated 4X Forensic provided no evidence to support its conclusion that the leak developed "over time," explaining that formation of the pinhole through a chemical reaction thinning out the pipe would "not necessarily take a long time to occur." Mumper noted 4X Forensic had not reviewed Nargizyan's water records to

11

determine whether he had experienced water loss consistent with a long-term leak.

F.      *The Trial Court's Ruling*

After a hearing, the superior court granted State Farm's motion for summary judgment. The court concluded State Farm met its initial burden to show the water loss was a result of continuous or repeated seepage or leakage such that State Farm's denial of coverage was proper under the policy. The court then found Nargizyan's "evidence calls into question the [4X Forensic] report State Farm relied upon to deny coverage of [Nargizyan's] claim." Although the court recognized "the actual findings" of the report were disputed, it concluded this evidence "fails to carry [Nargizyan's] burden because it does not sufficiently establish that State Farm was unreasonable in denying his insurance claim," noting in particular that State Farm had considered the investigations of third parties before denying the claim. Because it granted the summary judgment motion, the court did not address State Farm's alternative motion for summary adjudication.

Nargizyan timely appealed from the judgment.[3]

_____

[3]      After the court entered an order granting State Farm's summary judgment motion, Nargizyan filed requests for a statement of decision and for court findings. The record does not show a ruling was made as to the requests. However, a litigant is not entitled to a statement of decision in connection with a motion for summary judgment. (See *McMillin Companies, LLC v. American Safety Indemnity Co.* (2015) 233 Cal.App.4th 518, 532, fn. 21; *Dameshghi v. Texaco Refining & Marketing, Inc.* (1992) 3 Cal.App.4th 1262, 1284, disapproved on another ground

12

## DISCUSSION

" 'A motion for summary judgment or summary adjudication is properly granted only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." ' " (*Campbell v. FPI Management, Inc.* (2024) 98 Cal.App.5th 1151, 1161; see Code Civ. Proc., § 437c, subds. (c) & (f); *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618.)  We review a summary judgment or summary adjudication ruling de novo.  (*Campbell*, at p. 1161; accord, *Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 39.)  In so doing, we " 'liberally construe the evidence in support of the party opposing summary judgment [or summary adjudication] and resolve doubts concerning the evidence in favor of that party.' " (*Gonzalez*, at p. 39; accord, *Campbell*, at p. 1161.)[4]

---

in *Trope v. Katz* (1995) 11 Cal.4th 274, 292.)  Nargizyan also moved for a new trial on the bases of irregularity in the proceedings, legal error, and insufficient evidence.  The superior court denied the motion after a hearing.  This ruling is not challenged on appeal.

[4]    State Farm moves to strike United Policyholders' amicus curiae brief as unsupported by record citations.  We deny the motion but will ignore any unsupported references.  (*Casa Mira Homeowners Assn. v. California Coastal Com.* (2024) 107 Cal.App.5th 370, 383, fn. 2; Cal. Rules of Court, rule 8.204(a)(1)(C).)

A.    *Breach of Contract*

Nargizyan contends there is a triable issue of material fact as to whether State Farm breached the policy in denying his water loss claim.

1.    *Applicable law*

" 'An insured can pursue a breach of contract theory against its insurer by alleging the insurance contract, the insured's performance or excuse for nonperformance, the insurer's breach, and resulting damages.' " (*Case v. State Farm Mutual Automobile Ins. Co., Inc.* (2018) 30 Cal.App.5th 397, 402; accord, *Gharibian v. Wawanesa General Ins. Co.* (2025) 108 Cal.App.5th 730, 737.) " 'An insurer may "seek[ ] summary judgment on the ground the claim is excluded," in which case it has "the burden . . . to prove that the claim falls within an exclusion." ' " (*Mosley v. Pacific Specialty Ins. Co.* (2020) 49 Cal.App.5th 417, 423 (*Mosley*); accord, *Medina v. GEICO Indemnity Co.* (2017) 8 Cal.App.5th 251, 259.) " 'To satisfy its burden, an insurer need not "disprove every possible cause of the loss," and once the insurer establishes the claim is excluded, the burden shifts to the insured to show a triable issue of material fact exists.' " (*Mosley*, at p. 423; see also Code Civ. Proc., § 437c, subd. (p)(2) [a defendant moving for summary judgment has the initial burden of showing a cause of action has no merit, and if that burden is met, the burden shifts to the plaintiff to show a triable issue of material fact exists]; accord, *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, 853; *Luebke v. Automobile Club of Southern California* (2020) 59 Cal.App.5th 694, 702-703.)

"In general, interpretation of an insurance policy is a question of law that is decided under settled rules of contract

14

interpretation." (*State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 194; accord, *Yahoo Inc. v. National Union Fire Ins. Co. etc.* (2022) 14 Cal.5th 58, 67.) " 'Our goal in construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions. [Citations.] "If contractual language is clear and explicit, it governs." [Citations.] If the terms are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect " 'the objectively reasonable expectations of the insured.' " ' " (*Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 321; accord, *Yahoo Inc.*, at p. 67.) " 'To protect the interests of the insured, coverage provisions are interpreted broadly, and exclusions are interpreted narrowly.' " (*Mosley, supra*, 49 Cal.App.5th at p. 423.)

2. *A triable issue of material fact remains as to whether Nargizyan's loss fell within the exclusion for continuous or repeated leakage*

In his complaint, Nargizyan alleged State Farm breached the policy by denying coverage for his water loss claim. State Farm moved for summary judgment based on the policy's exclusion for loss caused by "continuous or repeated seepage or leakage" of water from a plumbing system.[5] State Farm thus had the initial burden of proving that exclusion applied to Nargizyan's claim.

---

[5] The parties do not dispute that the water event here involved a "leak" from a plumbing pipe and that the leak caused the damage to Nargizyan's home. Nargizyan also does not dispute that damage to the pipe itself was subject to a separate policy exclusion for wear, tear, or deterioration.

15

In its motion for summary judgment, State Farm argued it properly denied Nargizyan's claim under the continuous or repeated seepage or leakage exclusion because "the water damage at issue was caused over time due to a slowly developing leak." State Farm asserted Nargizyan had no evidence to "cast doubt on the conclusion that the leak had developed over time and eventually progressed to the point when [Nargizyan] noticed the warming in the tile floor and discovered the leak." For his part, Nargizyan asserted in opposition that no evidence established water was leaking from the pipe "for a long time" such that the leak could be considered "continuous or repeated" and thus subject to the exclusion's application. In other words, according to the parties' mutual interpretation of the policy language set forth in their respective summary judgment briefs, even if the exclusion does not expressly require a specific passage of time for a leak to be continuous or repeated, the exclusion applies only to leaks that occur gradually over some period of time. This understanding of the exclusion language aligns with a common interpretation of similar policy exclusions, and we thus apply it here. (See, e.g., *Mojica v. State Farm General Ins. Co.* (S.D.Cal. 2024) 735 F.Supp.3d 1247, 1255 (*Mojica*) [" '[S]eepage or leakage' exclusions are common in California insurance policies. They can take various forms but generally 'appl[y] to gradual [water] damage over a period of time.' "], quoting Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group) ¶ 6:326.)[6]

---

[6] For the first time on appeal, State Farm contends the continuous or repeated seepage or leakage exclusion has no temporal element, challenging Nargizyan's interpretation that

16

State Farm contends the leak in Nargizyan's pipe was gradual such that his loss was properly excluded. State Farm proffered evidence showing: (1) water sprayed out of a pinhole in the pipe in a consistent manner and (2) water damage included saturated insulation, wooden joists, and plywood subflooring, and water-permeated hardwood and marble tile flooring in the home interior that needed to be removed and replaced. State Farm argues the only reasonable conclusion that can be drawn is that water was gradually releasing from the pipe "for some period of time unbeknownst to Nargizyan and was not discovered on the first day of the leak but had been continuous and ongoing for some longer period of time."

State Farm also relied on 4X Forensic's conclusions that the leak was caused by a screw or nail puncture and developed "over time" as the screw or nail corroded. Citing 4X Forensic's report, State Farm contends it is reasonable to infer that water gradually dripped from the pipe for a period of time before the

_____

the exclusion only applies to "long term" leaks. However, "[i]n a summary judgment appeal, a party is ordinarily not permitted to change [its] position and adopt a new and different theory." (*Olson v. La Jolla Neurological Associates* (2022) 85 Cal.App.5th 723, 739; see *Zimmerman, Rosenfeld, Gersh & Leeds LLP v. Larson* (2005) 131 Cal.App.4th 1466, 1488 [" 'A new theory on appeal is . . . waived when the new theory involves a controverted factual situation not put in issue below.' "].) State Farm's separate statement did not include facts to show the parties mutually interpreted the exclusion to apply no matter how much time had passed before its discovery; thus, Nargizyan had no reason to proffer any facts in dispute on this issue. State Farm has therefore forfeited any contention that the policy exclusion at issue has no temporal element. (*Olson*, at p. 739.)

17

pinhole eventually grew to a size where a greater release rate and resulting water damage became noticeable to Nargizyan.

Even assuming this evidence is sufficient to conclude State Farm met its initial summary judgment burden, Nargizyan proffered evidence to show a triable issue nonetheless remains on whether the exclusion for continuous or repeated leaks applies. Nargizyan admits the water loss was caused by a pinhole leak. He emphasizes, however, that no evidence establishes how long water was leaking from the pinhole and other evidence suggests he discovered and repaired the leak quickly such that it constituted a sudden release of water as opposed to a gradual one.  Specifically, Nargizyan points to the following evidence: (1) despite walking barefoot in his house every day, June 6, 2020, was the first time in the 10 years since he built the house that he felt a temperature change in the kitchen tiles; (2) upon encountering the warm tiles, he immediately inspected the crawl space and discovered a hot water pipe spraying water into the insulation under the kitchen at a high rate of speed but no pooling or ponding of water or muddy soil under the spraying pipe; (3) he then immediately called a plumber, who repaired the pipe and took photographs and video that showed steam and a hissing sound of rapidly running water but no pooling of water in the soil; (4) no mold was discovered on the property; (5) during his inspection of the property, claim specialist John Foster reviewed a video of the spraying pipe and later described the water as spraying out at an estimated rate of three cups per minute; (6) Foster indicated in his inspection notes that the policy provided coverage because the situation "[d]oes not appear to be [continuous or repeated seepage or leakage]"; and (7) at 4X Forensic's determined release rate of 0.3 gallons per minute,

approximately 12,900 extra gallons of water would flow in a 30-day period, which would have been noticeable.  Nargizyan also relies on the declaration from his expert, Richard Mumper, who opined that the leak may have been caused by a chemical reaction, which would "not necessarily take a long time to occur," and criticized 4X Forensic's contrary conclusion of a screw or nail puncture as unsupported.  Nargizyan further points out that, despite testing the pipe, Agle testified he did not know when the leak started, how long it existed, or at what rate (or rates) water had previously released from the pipe as the leak developed.

A triable issue of material fact remains on Nargizyan's breach of contract claim.  Based on the evidence proffered by Nargizyan, a reasonable jury could conclude the leak from his hot water pipe constituted a sudden release of water such that his water loss was not subject to the continuous or repeated seepage or leakage exclusion.

State Farm relies on several cases in which summary judgment was granted based on a similar policy exclusion, but these cases are distinguishable.  (See *Freedman v. State Farm Ins. Co.* (2009) 173 Cal.App.4th 957 (*Freedman*); *Brown v. Mid-Century Ins. Co.* (2013) 215 Cal.App.4th 841 (*Brown*); *Mojica*, *supra*, 735 F.Supp.3d 1247.)

In *Freedman*, the parties stipulated to the following facts: A contractor drove a nail through a pipe when hanging drywall during the remodeling of an upstairs bathroom.  The pipe corroded around the nail's points of entry until water released through the areas of corrosion.  Years after the remodeling, the plaintiff homeowners discovered " 'extensive water leakage . . . in the upstairs bathroom wall.  One wall was discolored and wet.  The drywall fell apart on touch and mold was seen on pieces of

19

the wall.  The tile floor was wet and the ceiling immediately downstairs was wet and soft.' . . . A damage restoration company [also] discovered mold both upstairs and downstairs." (*Freedman*, *supra*, 173 Cal.App.4th at pp. 960-961.)  State Farm denied the plaintiffs' claim under a continuous or repeated seepage or leakage exclusion, and the Court of Appeal affirmed the grant of summary judgment in State Farm's favor.  (*Id.* at pp. 960, 963-964.)  The appellate court determined that "[g]iven the small size of the hole(s) through which the water leaked, and given the extensive amount of water damage . . . , the leak must have lasted a sufficiently long time, or stopped and started sufficiently many times, to count as 'continuous' or 'repeated' under any reasonable construction of those terms."  (*Id.* at p. 964.)

State Farm argues the same inference of a gradual and thus continuous or repeated leak can be drawn here.  But State Farm focuses only on those facts that support a one-to-one comparison with *Freedman*—the small-sized hole in the plumbing pipe and the substantial water damage.  Unlike in *Freedman*, however, where it was undisputed that a contractor had made the hole with a nail years before the leak was discovered, there is conflicting evidence in this case regarding the timing or cause of the pinhole, with the Mumper declaration disagreeing with 4X Forensic's conclusion that the hole developed "over time" from a screw or nail puncture and subsequent corrosion.  There is also evidence here that the leak occurred suddenly, including Nargizyan's testimony regarding his lack of prior discovery of the leak and quick response upon discovering water rapidly spraying from the pipe.  Moreover, unlike in *Freedman*, here there was no evidence of mold or disintegrating

20

materials that suggested water had leaked over an extended period of time.  (See also *Vargas v. State Farm General Insurance Company* (C.D.Cal., July 19, 2021, No. CV 20-09935 PA (JCx)) 2021 WL 4434357 at \*1, \*4, \*5 [denying summary judgment because of triable issue as to whether water damage was caused by "continuous or repeated seepage or leakage of water"; distinguishing *Freedman* based on lack of evidence (such as mold) that damage resulted from long-term leak, and noting plaintiff's evidence that "water was coming out heavily from the pipe, and that the water damage was observed over a period of one day"]; *Gershkowitz v. State Farm General Insurance Co.* (C.D.Cal., Dec. 29, 2021, No. 2:21-CV-01655-SVW-E) 2021 WL 6752322 at \*9 [denying summary judgment in case turning on same exclusion and finding *Freedman* "inapposite" because "there is no similar 'extensive' evidence of damage that necessarily occurred over a long period of time"].)

 *Brown* is likewise inapposite.  In that case, a leaking hot water pipe caused water damage that included extensive mold in multiple rooms in the plaintiffs' home.  (*Brown*, *supra*, 215 Cal.App.4th at pp. 844-847.)  The insurer denied the plaintiffs' claim, finding the damage fell within an exclusion for "water, or the presence of water, over a period of time from any constant or repeating gradual, intermittent or slow discharge, seepage, leakage, trickle, collecting infiltration, or overflow of water from any source." (*Id.* at pp. 846-847.)  On summary judgment, the insurer presented evidence showing the plaintiffs had begun noticing evidence of the leak a month before it was repaired.  In addition, an expert who inspected the broken pipe and the plaintiffs' water consumption records opined that water had leaked through a pinhole in the pipe that grew over time as a

result of corrosion and lasted at least five months.  (*Id.* at pp. 848-849.)  The plaintiffs did not dispute this evidence and instead argued a triable issue existed based on other evidence suggesting the creation of the hole in the pipe occurred suddenly.  (*Id.* at pp. 849-852.)  This court affirmed the grant of summary judgment to the insurer, explaining that even if the pipe " 'failed suddenly,' " undisputed evidence showed water then released from the pipe "constantly and gradually over time" for a period of " 'a month or two' (according to the [plaintiffs]) or five months (according to [the insurer])."  (*Id.* at pp. 851-854.)

There is no comparable evidence here regarding an estimated duration of a months-long leak.  Moreover, in contrast to the plaintiffs in *Brown*, Nargizyan testified he acted immediately upon first noticing a sign of the leak.  Other evidence such as the Mumper declaration and photographs and testimony regarding a lack of pooling water support Nargizyan's theory that he sustained a sudden release of water and conflict with State Farm's theory that the leak gradually developed over time.  And as with the imperfect comparison to *Freedman*, there is also no evidence of mold—much less the extensive mold experienced by the *Brown* plaintiffs—to suggest Nargizyan's damage resulted from a gradual leak.

In *Mojica*, the plaintiff homeowners suffered water damage from a leak in a water supply line under their house.  (*Mojica*, *supra*, 735 F.Supp.3d at pp. 1251-1252.)  In arguing the leak was continuous or repeated, State Farm relied on an expert who estimated the duration of the leak as between 13.3 and 42 days.  (*Id.* at p. 1256.)  The expert based his calculations on the plaintiffs' water consumption records and a statement from the plumber that the leak was from a hole that was "slightly larger

22

than the tip of a pen." (*Ibid.*) State Farm also pointed to evidence of the extent of the water damage, including the buckling and warping of hardwood flooring in multiple rooms in the house and cracking of tile flooring. (*Ibid.*) For their part, the plaintiffs pointed to evidence of a lack of mold and an estimate from their expert that the leak instead lasted 5.8 days. (*Id.* at p. 1257.) The court granted summary judgment to State Farm, explaining that even at the shorter duration of 5.8 days, a consistent leak from a hole the size of a pen tip did not constitute a sudden, one-time flood of water. (*Id.* at pp. 1257-1258.) The Ninth Circuit affirmed, holding the exclusion applied based on "the multi-day duration of the leak, the small size of the hole, and the widespread nature of the damage." (*Mojica v. State Farm General Insurance Co.* (9th Cir., Dec. 11, 2025, No. 24-5597) 2025 WL 3553034, at *1.)

Unlike the insurer in *Mojica,* State Farm did not present any evidence about the estimated duration of the leak. 4X Forensic's report was intended to identify the cause of the leak, not its duration. Agle provided a vague statement in that report that "[t]he leak rate would have grown over time" but could not further explain or support that opinion in his deposition. He testified instead that he did not know and could not estimate when the leak started, how long it existed, or at what rate (or rates) water had previously released from the pipe as the leak developed.

A triable issue of material fact thus remains regarding whether the leak in Nargizyan's hot water pipe lasted long enough to be "continuous or repeated." Because there is a triable issue on the breach of contract cause of action, we reverse the order granting State Farm's motion for summary judgment.

23

B.	*Breach of the Covenant of Good Faith and Fair Dealing*

State Farm sought summary adjudication on Nargizyan's cause of action for breach of the covenant of good faith and fair dealing.  Nargizyan contends there is a triable issue regarding whether State Farm's conduct in denying his water loss claim was reasonable and not in bad faith.

1.	*Applicable law*

"The law implies in every contract, including insurance policies, a covenant of good faith and fair dealing."  (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720 (*Wilson*); accord, *Bartel v. Chicago Title Ins. Co.* (2025) 111 Cal.App.5th 655, 698.)  The implied covenant of good faith and fair dealing is "based on general contract law and the long-standing rule ' "that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." ' "  (*Waller v. Trucker Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36.)  "[T]he covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement."  (*Ibid.*)

"To fulfill its implied obligation, an insurer must give at least as much consideration to the interests of the insured as it gives to its own interests."  (*Jordan v. Allstate Ins. Co.* (2007) 148 Cal.App.4th 1062, 1072.)  In the context of the denial of insurance benefits, " '[t]here are at least two separate requirements to establish [a] breach of the implied covenant: (1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause.' "  (*Mosley, supra,*

24

49 Cal.App.5th at p. 436; accord, *Nieto v. Blue Shield of California Life & Health Ins. Co.* (2010) 181 Cal.App.4th 60, 86 (*Nieto*) [" 'To give rise to tort liability for bad faith, the insurer's conduct not only must be erroneous but "unreasonable" or "without proper cause" as well.' "].)  The linchpin of proving such a breach "is that the denial of coverage was unreasonable." (*McCoy v. Progressive West Ins. Co.* (2009) 171 Cal.App.4th 785, 793; accord, *Nieto*, at p. 86 ["The ultimate test is whether the insurer's conduct was unreasonable."].)

Unreasonableness may be shown when an insurer fails to fully investigate a claim or denies the claim relying on an unfounded factual basis or after ignoring available evidence that supports the claim.  (*Wilson, supra*, 42 Cal.4th at pp. 720-721.) "The insured must show the insurer's conduct 'demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement.' "  (*Mosley, supra*, 49 Cal.App.5th at pp. 435-436; accord, *Nieto, supra*, 181 Cal.App.4th at p. 86; *Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 346 (*Chateau Chamberay*).)  In other words, " 'an insurer does not act in bad faith when it mistakenly withholds policy benefits, if the mistake is reasonable or is based on a legitimate dispute as to the insurer's liability.' [Citation.]  'An insurer which denies benefits reasonably, but incorrectly, will be liable only for damages flowing from the breach of contract, i.e., the policy benefits.' " (*Mosley*, at p. 436.)  "Moreover, the reasonableness of the

insurer's decisions and actions must be evaluated as of the time that they were made; the evaluation cannot fairly be made in the light of subsequent events which may provide evidence of the insurer's errors."  (*Chateau Chamberay*, at p. 347.)

"One of the ways an insurer can negate an insured's claim that it has acted unreasonably or without proper cause is to demonstrate the existence of a 'genuine dispute' regarding coverage or the amount or extent of the insured's claimed loss."  (*Jordan v. Allstate Ins. Co.*, *supra*, 148 Cal.App.4th at p. 1072; accord, *Chateau Chamberay*, *supra*, 90 Cal.App.4th at p. 347 ["where there is a *genuine issue* as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute"].)  " ' "[A]n insurer denying . . . policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability . . . is not liable in bad faith even though it might be liable for breach of contract." ' "  (*Bosetti v. United States Life Ins. Co. in the City of New York* (2009) 175 Cal.App.4th 1208, 1237, italics omitted.)  However, "[a] *genuine* dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds."  (*Wilson*, *supra*, 42 Cal.4th at p. 723.)  Thus, the genuine dispute rule "does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim."  (*Ibid.*; see *Bosetti*, at p. 1237 ["An insurer cannot claim the benefit of the genuine dispute doctrine based on an investigation or evaluation of the insured's claim that is not full, fair and thorough."].)  The genuine dispute doctrine also does not apply when the insurer conducts a biased investigation.  (*Chateau Chamberay*, at

pp. 348-349; accord, *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.* (9th Cir. 2014) 752 F.3d 807, 823.)

" 'While the reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact, it becomes a question of law where the evidence is undisputed and only one reasonable inference can be drawn from the evidence.' " (*Nieto, supra,* 181 Cal.App.4th at p. 86; accord, *Chateau Chamberay, supra,* 90 Cal.App.4th at p. 350; see also *Wilson, supra,* 42 Cal.4th at p. 724 ["Nor does the [genuine dispute] rule alter the standards for deciding and reviewing motions for summary judgment. 'The genuine [dispute] rule in the context of bad faith claims allows a . . . court to grant summary judgment when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable . . . .' "].)

2. *A triable issue of material fact remains as to the reasonableness of State Farm's conduct*

At summary judgment, State Farm presented evidence suggesting it inquired of and considered observations and evidence provided by every party—Nargizyan, the plumber, ServPro, the public adjuster, and 4X Forensic. State Farm argues this evidence demonstrates it fairly investigated Nargizyan's water loss claim before denying coverage.

The problem with this argument is it neglects evidence suggesting State Farm failed to fully investigate the claim and ignored other available evidence in reaching its coverage conclusion. For instance, Nargizyan contends State Farm "denied coverage under the [continuous or repeated seepage or leakage] exception without bothering to investigate how long the water discharged from the pipe." State Farm relied primarily on the 4X Forensic report in denying the claim, even though the

27

report did not attempt to ascertain or estimate when the leak may have first sprung.

Nargizyan also points to the criticisms from his public adjuster and Mumper that 4X Forensic's conclusion that a screw or nail puncture caused the leak was based on nothing more than the circular nature of pinhole. The public adjuster raised this point to Agle and State Farm after he received a copy of 4X Forensic's report, emphasizing that 4X Forensic's photographs of the inside of the pipe were inconsistent with a screw or nail puncture and inspection of the crawl space did not reveal a screw, nail, or other sharp object where the pinhole was found. Mumper cited the same evidence in his expert declaration before opining that, as another possible cause, a chemical reaction on the surface of the pipe could have formed the pinhole shortly before Nargizyan discovered the leak. In standing behind the report's conclusions, Agle and State Farm provided no substantive response to the public adjuster's raised concerns.

Nargizyan also points to the fact that State Farm retained 4X Forensic only after its own claim specialist inspected the property and concluded upon watching a video of the leak that coverage should be provided because the loss did not appear to have been caused by a continuous or repeated leak. Nargizyan asserts this sequence suggests State Farm retained 4X Forensic to "overturn" Foster's conclusion and thus allow it to deny his claim while insulating itself from bad faith allegations. He also points to testimony from Agle that 4X Forensic was previously retained by State Farm more than 3,000 times, arguing this extensive history suggests the firm was biased in reaching conclusions favorable to State Farm's position. Nargizyan contends State Farm acted unreasonably by making the facts of

loss fit the exclusion without giving him the benefit of the doubt as the insured.

Even if State Farm carried its initial burden, Nargizyan has demonstrated a triable issue on whether the "genuine dispute" doctrine relieved State Farm from liability on the implied covenant cause of action. As noted, the rule does not relieve an insurer from its obligation to thoroughly and fairly investigate the insured's claim. (*Wilson, supra*, 42 Cal.4th at p. 723.) And "an insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably." (*Zubillaga v. Allstate Indemnity Co.* (2017) 12 Cal.App.5th 1017, 1030; accord, *Wilson*, at pp. 723-724.) A reasonable jury could conclude State Farm failed to conduct a sufficient investigation into the duration of the leak and ignored available evidence and alternative theories of the pinhole's creation before denying the claim. Further, a jury could reasonably question the timing of State Farm's retention of 4X Forensic after its own claim specialist inspected the property and concluded the loss would be covered. State Farm is not entitled to summary adjudication under the genuine dispute doctrine.

C.    *Punitive Damages*

State Farm also requested summary adjudication on Nargizyan's claim for punitive damages as relief on his implied covenant cause of action. State Farm contends the court can conclude as a matter of law that State Farm did not engage in the type of despicable conduct sufficient to satisfy the standard for punitive damages, and that in any event Nargizyan proffered no

evidence that the conduct at issue was committed or ratified by a managing agent of State Farm.

Civil Code section 3294 authorizes an award of punitive damages when a plaintiff proves by clear and convincing evidence that the "defendant has been guilty of oppression, fraud, or malice." (§ 3294, subd. (a).) "Malice" is defined as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others"; "oppression" is defined as "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights"; and "fraud" is defined as "intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." (§ 3294, subd. (c)(1)-(3).)

"An insurer is not permitted to rely selectively on facts that support its position and ignore those facts that support a claim. Doing so may constitute bad faith. [Citations.] When sufficiently egregious, an insurer's intentional disregard of facts supporting a claim also meets the standard for punitive damages." (*Mazik v. Geico General Ins. Co.* (2019) 35 Cal.App.5th 455, 462.) The same evidence that raises a triable issue on the implied covenant cause of action also raises a triable issue on whether State Farm acted in willful and conscious disregard of Nargizyan's rights by failing to conduct a thorough investigation, using a biased expert who rendered a report that lacked foundation, and changing its coverage decision without a reasonable justification. (See, e.g., *id.* at pp. 466-467 [evidence at trial that insurance company " 'deliberately "cherry-picked" medical information and

30

disregarded unfavorable findings' " constituted "sufficient evidence for the jury to conclude that [insurer's employee] engaged in oppressive conduct by ignoring information concerning the serious and permanent nature of [plaintiff's] injuries for the purpose of saving the company money"].)

A triable issue also remains as to whether State Farm's conduct was committed or ratified by a State Farm officer, director, or managing agent as required under Civil Code section 3294, subdivision (b). Under that provision, an employer shall not be liable for punitive damages based on its employee's acts, "unless the employer [1] had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or [2] authorized or ratified the wrongful conduct for which the damages are awarded or [3] was personally guilty of oppression, fraud, or malice." Moreover, "[w]ith respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation." (Civ. Code, § 3294, subd. (b).)

"[B]y selecting the term 'managing agent,' and placing it in the same category as 'officer' and 'director,' the Legislature intended to limit the class of employees whose exercise of discretion could result in a corporate employer's liability for punitive damages." (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 573 (*White*).) The term is subject to a narrow construction that limits corporate liability for punitive damages to only those employees who "exercise substantial discretionary authority over decisions that ultimately determine corporate policy." (*Id.* at pp. 576-577.) "Thus, supervisors who have broad discretionary

31

powers and exercise substantial discretionary authority in the corporation could be managing agents." (*Id.* at p. 577.)

To demonstrate that a corporate employee is a "true managing agent," a plaintiff seeking punitive damages must show that "the employee exercised substantial discretionary authority over significant aspects of a corporation's business." (*White, supra*, 21 Cal.4th at p. 577.) Decisions that meet this standard concern formal policies that affect a substantial portion of the company—the type of decision "likely to come to the attention of corporate leadership." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 715.) A managing agent's discretion is the "sort of broad authority that justifies punishing an entire company for an otherwise isolated act of oppression, fraud, or malice." (*Ibid.*)

In *Egan v. Mut. of Omaha Ins. Co.* (1979) 24 Cal.3d 809 (*Egan*), cited with approval in *White, supra*, 21 Cal.4th at pages 571, 573, 575, the defendant insurer argued conduct by its claims manager and claims adjuster did not involve " 'high-level policy making' " and thus punitive damages could not be awarded against the insurer based on these employees' conduct. (*Egan*, at p. 822.) The Supreme Court held that "[t]he determination whether employees act in a managerial capacity, however, does not necessarily hinge on their 'level' in the corporate hierarchy. Rather, the critical inquiry is the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy. When employees dispose of insureds' claims with little if any supervision, they possess sufficient discretion for the law to impute their actions concerning those claims to the corporation." (*Id.* at pp. 822-823.) The court was satisfied that the authority vested in the claims manager and the

claims adjuster "was sufficient to justify the imposition of punitive damages" against the insurer because "they exercised broad discretion in the disposition of plaintiff's claim" as well as others' claims, "necessarily result[ing] in the ad hoc formulation of policy." (*Id.* at p. 823; accord, *Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1221 [insurance "claims managers that exercise substantial discretionary authority to pay or deny claims exercise 'substantial discretionary authority over decisions that ultimately determine corporate policy' "]; see *Mazik v. Geico General Ins. Co.*, *supra*, 35 Cal.App.5th at pp. 465-466 [regional liability administrator for insurance company was "managing agent" where he oversaw settlement of claims for Orange County, Los Angeles, San Bernardino, and Alaska, exercised broad decisionmaking responsibility in establishing the company's settlement standards, and " 'ultimately determine[d] corporate policy' "].)

State Farm asserts that, in Nargizyan's responses to interrogatories demanding the facts supporting his claim for punitive damages, Nargizyan only identified conduct by claim specialist Gilman. When asked to describe "the conduct of any officer, director, or managing agent of State Farm which you allege supports your claim for punitive damages," Nargizyan responded in conclusory fashion that "State Farm ratified" Gilman's conduct. State Farm proffered evidence in its separate statement that Gilman was a "Proximity Claim Specialist" who handled claims. In her declaration, claims team manager Blazewich stated that "Gilman is not an officer, director, or managing agent." Accordingly, State Farm contended summary adjudication of the punitive damages claim was proper because

there was no evidence an officer, director, or managing agent ratified the conduct at issue.

In opposing summary judgment, Nargizyan asserted he had responded to the interrogatories almost two years earlier, and since then had learned new information through discovery, including that Blazewich directed Gilman to deny Nargizyan's claim. Nargizyan contended Blazewich was a "managing agent" for State Farm who had ratified Gilman's conduct. Nargizyan proffered evidence that Blazewich had "broad decision-making authority" and responsibility for overseeing the handling of claims by claim specialists who reported to her, including providing direction on whether to cover, deny, or settle claims. He pointed to Blazewich's deposition testimony that, as a claims team manager, she had supervisory authority to grant or deny coverage of claims. Blazewich testified that in her 26 years as a team manager she had worked on or overseen "[t]housands of claims" and that it was part of her job to ensure her reporting claim specialists "comply with [State Farm's] standard claims processes" and apply the guidelines set forth in State Farm's claim-handling Operation Guide.

On appeal, State Farm argues in one sentence that Nargizyan "attempted to move the 'bad faith' goalposts" by focusing on Blazewich's ratification of Gilman's bad faith conduct when Blazewich was not identified in Nargizyan's interrogatory responses. But State Farm does not suggest Nargizyan had a duty to serve amended or supplemental responses after he learned new information through discovery suggesting Blazewich was a managing agent who ratified Gilman's conduct. (Cf. Code Civ. Proc., § 2030.060, subd. (g) ["An interrogatory may not be made a continuing one so as to impose on the party responding to

34

it a duty to supplement an answer to it that was initially correct and complete with later acquired information."].) Nor does State Farm provide any argument or citations to authority demonstrating we may not consider the evidence Nargizyan presented in opposition to the summary judgment motion suggesting Blazewich was a managing agent who ratified Gilman's conduct. Given Blazewich's admissions about her broad discretion to direct that claims be covered or denied and the evidence that she instructed Gilman to deny Nargizyan's claim, a triable issue remains regarding whether she is a managing agent under Civil Code section 3294, subdivision (b). (See *Egan, supra,* 24 Cal.3d at p. 823; accord, *Major v. Western Home Ins. Co., supra,* 169 Cal.App.4th at p. 1221.) In sum, triable issues remain regarding the claim for punitive damages.[7]

## DISPOSITION

The judgment in State Farm's favor is reversed. The superior court is directed to vacate its order granting the motion for summary judgment and to enter a new order denying the

/ / /

---

[7] Because we reverse the judgment and remand for further proceedings, we need not reach Nargizyan's argument that, under Code of Civil Procedure section 437c, subdivision (h), the superior court erred in granting summary judgment despite pending discovery and motions to compel discovery responses that the court had scheduled to be heard after the summary judgment hearing.

motion and the motion for summary adjudication.  Nargizyan shall recover his costs on appeal.


                                    STONE, J.

We concur:


SEGAL, Acting P. J.


FEUER, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| LEVON NARGIZYAN,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>STATE FARM GENERAL INSURANCE COMPANY,<br><br>    Defendant and Respondent. | B342340<br>(Los Angeles County<br>Super. Ct. No. 21STCV32834)<br><br>**ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PUBLICATION**<br><br>[NO CHANGE IN APPELLATE JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on April 15, 2026 be modified as follows:

1.    The paragraph commencing at the bottom of page 28 with "Nargizyan also points" and ending at the top of page 29 with "as the insured" is modified to have the following sentence removed:

> He also points to testimony from Agle that 4X Forensic was previously retained by State Farm more than 3,000 times, arguing this extensive history

suggests the firm was biased in reaching conclusions favorable to State Farm's position.

2.      On page 29, in the first full paragraph the word "likely" is added to the sentence starting with "A reasonable jury" and ending with "denying the claim" so that the sentence reads:

> A reasonable jury could conclude State Farm failed to conduct a sufficient investigation into the likely duration of the leak and ignored available evidence and alternative theories of the pinhole's creation before denying the claim.

3.      In the paragraph commencing at the bottom of page 30, beginning with "'An insurer is'" and ending at the top of page 31 with "'the company money,'" the phrase "using a biased expert who rendered a report that lacked foundation" is changed to "ignoring available evidence" so the relevant sentence reads:

> The same evidence that raises a triable issue on the implied covenant cause of action also raises a triable issue on whether State Farm acted in willful and conscious disregard of Nargizyan's rights by failing to conduct a thorough investigation, ignoring available evidence, and changing its coverage decision without a reasonable justification.

There is no change in the appellate judgment.

The opinion in the above-entitled matter filed on April 15, 2026 was not certified for publication in the Official Reports.  For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.


SEGAL, Acting P. J.        FEUER, J.        STONE, J.